IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF THE FOLLOWING ASSET:<br><br>2015 MINI Cooper Wagon 4D Countryman vehicle with VIN WMWZB3C54FWR44610. | CASE NO.   20-MJ-1671<br><br>FILED UNDER SEAL |

### AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Kurt Leonard Kuechler, being duly sworn, do hereby state as follows:

#### Introduction

    1.    I am employed as a Special Agent with the Federal Bureau of Investigation (FBI). I am assigned to the Economic Crimes Squad of the Philadelphia Division of the FBI, where I have been employed since 2009.  My duties and responsibilities as a Special Agent include the investigation of criminal violations of federal law.  I received specialized training from the FBI Academy located in Quantico, Virginia, and subsequent training, on-the-job and elsewhere, regarding the investigation and identification of financial crimes, including bank, bankruptcy, mortgage, and corporate fraud.  I have conducted and participated in multiple investigations, performed physical surveillances, and participated in the execution of numerous arrest, search, and seizure warrants.  My experience also includes five years as a Supervisory Bank Examiner for the Commonwealth of Massachusetts Division of Banks, investigating violations of federal and state statutes and regulations regarding financial institutions.

    2.    I am a case agent involved in the investigation of Susan ("Dee") Gracece COPELAND, who is believed to have embezzled over $1 million from her former employer, Collision Care, a Philadelphia-based auto body company.  I believe COPELAND's conduct constitutes fraud and related activity in connection with bank and mail fraud, in violation of 18 U.S.C. §§ 1344 and 1341, false statements, in violation of 18 U.S.C. § 1001, aggravated identity theft, in violation of 18 U.S.C. § 1028A, and false tax returns, in violation of 26 U.S.C. § 7206(1).

    3.    The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, review of documents, knowledge obtained from other individuals, and communications with others who have personal knowledge of the events and circumstances described herein.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a seizure warrant, this affidavit does not set forth each and every fact learned by me or other agents in the course of this investigation.  I have set forth only the facts that I believe are necessary to

establish probable cause in support of the application for a seizure warrant. All information contained in this affidavit is known to be true and correct to the best of my knowledge.

## Purpose of Affidavit

4. This affidavit is submitted in support of an application for a combined criminal and civil forfeiture seizure warrant for the following vehicle (SUBJECT VEHICLE):

   a. 2015 MINI Cooper Wagon 4D Countryman vehicle with VIN WMWZB3C54FWR44610. The vehicle was last seen bearing Pennsylvania license plate PD0724T on October 5, 2020, parked in the vicinity of 1838 Packer Avenue, Philadelphia, Pennsylvania, COPELAND's residence.

5. As set forth below, I submit that there is probable cause to believe that the SUBJECT VEHICLE is property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of a violation of 18 U.S.C. § 1344 (bank fraud). The SUBJECT VEHICLE is therefore subject to criminal forfeiture to the United States under 18 U.S.C. § 982(a)(2).

6. I further submit that there is probable cause to believe that the SUBJECT VEHICLE is property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. 1344 (bank fraud). The SUBJECT VEHICLE is therefore subject to civil forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

7. I further submit that there is probable cause to believe that the SUBJECT VEHICLE is property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1341 (mail fraud). The SUBJECT VEHICLE is therefore subject to criminal forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C), as implemented and made applicable to criminal forfeiture by 28 U.S.C. § 2461(c).

8. I additionally submit that there is probable cause to believe that the SUBJECT VEHICLE is property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1341 (mail fraud). The SUBJECT VEHICLE is therefore subject to civil forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C), because 18 U.S.C. § 1341 constitutes a "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7).

## Forfeiture and Seizure Authority

9. As to civil forfeiture for bank fraud, under 18 U.S.C. § 981(a)(1)(C), "[t]he following property is subject to forfeiture to the United States: . . . (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section [1344 of Title 18 (bank fraud)]." As to civil forfeiture for mail fraud, under 18 U.S.C. § 981(a)(1)(C), "[t]he following property is subject to forfeiture to the United States: . . . (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title)." Mail fraud, in

violation of 18 U.S.C. 1341, is a "specified unlawful activity." Property subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C) may be seized pursuant to 18 U.S.C. § 981(b).

10. As to criminal forfeiture for bank fraud, under 18 U.S.C. § 982(a)(2), "[t]he court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate [18 U.S.C. § 1344 (bank fraud)]… shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." As property subject to criminal forfeiture under 18 U.S.C. § 982(a)(2), the SUBJECT VEHICLE may be seized pursuant to 21 U.S.C. § 853(f), by 18 U.S.C. § 982(b)(1).

11. As to criminal forfeiture for mail fraud, under 18 U.S.C. § 981(a)(1)(C), as implemented and made applicable to criminal forfeiture by 28 U.S.C. § 2461(c), "[t]he following property is subject to forfeiture to the United States . . . (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title)." Mail fraud, in violation of 18 U.S.C. § 1341 constitutes a "specified unlawful activity" because it is enumerated in 18 U.S.C. § 1956(c)(7). As property subject to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C), as implemented by 28 U.S.C. § 2461(c), the SUBJECT VEHICLE may be seized pursuant to 21 U.S.C. § 853(f), as set forth in 28 U.S.C. § 2461(c).

12. With respect to seizure, 21 U.S.C. § 853(f) specifically provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that a[] protective order under [21 U.S.C. § 853(e)] may not be sufficient to assure the availability of the property for forfeiture." As set forth further below, there is a substantial risk that the SUBJECT VEHICLE would be moved or otherwise become unavailable for forfeiture unless immediate steps are taken to secure it at the time this warrant is executed. Because the SUBJECT VEHICLE is a small car, by its nature, it can be easily moved under its own power and secreted in a location that is unknown to law enforcement. It could also be sold and its proceeds transferred or dissipated. I therefore submit that a protective order under 21 U.S.C. § 853(e) would not be sufficient to assure that the SUBJECT VEHICLE will remain available for forfeiture.

13. For the reasons listed above, the United States seeks a combined criminal and civil seizure warrant, authorizing law enforcement to seize the SUBJECT VEHICLE and preserve it pending further forfeiture proceedings.

## STATEMENT OF PROBABLE CAUSE

### Background

14. At all relevant times, Collision Care, Inc. ("Collision Care") was a corporation of the Commonwealth of Pennsylvania that was in the business of operating auto body shops in the greater Philadelphia area.

3

15. An individual person, identified here as VF, started Collision Care in about 2001. By 2016, VF had expanded Collision Care's business to seven locations in the metropolitan Philadelphia area.

16. SUSAN G. COPELAND was VF's godmother. Shortly after starting the Collision Care business in 2001, VF offered COPELAND a position as a customer service representative in that business. By 2004 Collision Care had expanded to multiple locations and VF offered COPELAND a promotion to a position overseeing Collision Care's accounts payable. Thereafter, VF promoted COPELAND to the position of Collision Care's controller and, by 2006, had added COPELAND as a signatory to Collision Care's bank accounts.

17. Collision Care maintained a checking account, with number ending in 9717, at what is now Santander Bank (the "Collision Care Account"). Santander Bank's accounts are insured by the Federal Deposit Insurance Corporation, certificate number 29950. Santander Bank is the successor institution to Sovereign Bank, which was also insured by the Federal Deposit Insurance Corporation under the same certificate number.

## The Embezzlement Scheme

18. Beginning in at least as early as June 2010, SUSAN G. COPELAND used her position as Collision Care's controller, and the unquestioning trust that VF reposed in her by virtue of their family relationship, to embezzle, misappropriate, and misapply funds belonging to VF and Collision Care to her own personal use.

19. SUSAN G. COPELAND prepared checks on the Collision Care Account without the knowledge, authority, or approval of VF, and made them payable to persons or entities of her own choosing. At times COPELAND used her own name as the maker of the unauthorized checks drawn on the Collision Care account. Mostly, however, COPELAND forged VF's signature on the unauthorized Collision Care Account checks that she prepared.

20. From my review of the Collision Care Account, from my interviews of VF, and from my interviews of VF's bookkeeper, I have determined that between about June 2010 and about February 2018, SUSAN G. COPELAND prepared and used about at least 1,700 unauthorized checks on the Collision Care Account. COPELAND used the unauthorized Collision Care Account checks that she had prepared for her own personal purposes and not for expenses related to the legitimate business of Collision Care. Through those unauthorized checks, COPELAND embezzled, misappropriated, and misapplied more than $1 million.

21. Among other things, SUSAN G. COPELAND used unauthorized Collision Care Account checks to make in excess of $170,000 in payments on retail charge accounts for goods purchased by her, including to her personal credit accounts at Bloomingdale's, Nordstrom, Macy's, Lord & Taylor, Pier-1 Imports, Sears, Target, and Neiman Marcus. COPELAND also used unauthorized Collision Care Account checks to make in excess of $60,000 of payments of her own utilities and taxes, including payments to Verizon, Comcast, T-Mobile, PECO, Philadelphia Gas Works, Water Revenue Bureau, and the City of Philadelphia. COPELAND

4

also used unauthorized Collision Care Account checks to make payments toward insurance policies in COPELAND's name, including payments to Aetna Insurance Company, American National Insurance Company, Keystone Health Company, and Nationwide Insurance Company.

22. SUSAN G. COPELAND also used unauthorized Collision Care Account checks to make payments toward credit cards and into bank accounts in COPELAND's name and her husband's name. Among these were payments to COPELAND's Chase Bank and Capital One credit card accounts and her husband's Chase Bank credit card accounts.

23. In addition to using Collision Care checks to make payments for her own benefit, SUSAN G. COPELAND also used unauthorized Collision Care Account checks to make in excess of $150,000 in cash payments to herself, some made payable in her own name, some made payable to cash, and some made payable to petty cash. COPELAND issued more than $80,000 of unauthorized Collision Care Account checks in VF's name, which COPELAND also used for her own personal purposes.

24. In about December 2014, SUSAN G. COPELAND purchased a 2015 MINI Countryman automobile. After a trade-in and a down payment, COPELAND financed the remainder of that purchase through a loan from BMW Financial Services for approximately $16,000. COPELAND used unauthorized Collision Care Account checks to make more than $16,000 in payments toward the automobile loan on the MINI Countryman.

25. In about September 2017, SUSAN G. COPELAND and her husband, GC, purchased a 2017 Honda CR-V automobile. As part of the purchase transaction, COPELAND traded in a 2011 Honda automobile which, in turn, had been purchased with funds from the Collision Care Account.

### Copeland's Efforts to Avoid Detection.

26. Collision Care used the computerized bookkeeping program "Quickbooks" to keep track of checks in the Collision Care Account. As Collision Care's controller, the company's Quickbooks program was under SUSAN G. COPELAND's authority and control. From my review of those records, and from my conversations with other agents and Collision Care's bookkeeper, I have determined that COPELAND typically falsified the entries in Collision Care's Quickbooks program to make it appear that the unauthorized Collision Care Account checks that she had issued for her own personal benefit had, contrary to fact, been issued in payment of legitimate expenses of Collision Care.

27. For example, on or about January 9, 2016, COPELAND used forged Collision Care Account check number 90788 to make a payment of $588.49 to her personal Chase Bank credit card, which had an account number ending in 9217 (the "Chase Credit Card). That forged check was made payable to Chase Card Services and had COPELAND's account number in its memo line. In the Collision Care Quickbooks, Collision Care Account check number 90788 was correctly listed as having been issued on January 9, 2016, and was correctly listed as having been issued in the amount of $588.49. However, the Collision Care Quickbooks entry for check number 90788 falsely listed the recipient of that check as Davis Acura when in truth and in fact it

had been used to make a payment to SUSAN G. COPELAND's Chase Credit Card.  According to the Quickbooks audit trail database, that false entry was made on January 9, 2016, by COPELAND.

28. In about 2016, VF decided to sell Collision Care to one of his competitors, identified here as Business Number One.  VF negotiated an agreement with Business Number One in which he would immediately transfer all of his Collision Care locations to Business Number One, with the exception of the single location where VF leased rather than owned the premises.  Business Number One also hired VF for a management position with Business Number One.

29. As part of his negotiations with Business Number One, VF also secured a position for SUSAN G. COPELAND as a supervisor for Business Number One who was responsible for overseeing certain personnel at all of Business Number One's locations.  COPELAND's last day of employment for Collision Care was July 1, 2016.  However, as part of her responsibilities to Business Number One, COPELAND maintained an office at 2052 Washington Avenue, Philadelphia, Pennsylvania.  VF also maintained an office in that same premises, from which he continued to operate the single Collision Care Location that had not yet been sold to Business Number One.

30. In about February, 2018, as he was making preparations to transfer the final Collision Care location to Business Number One, VF discovered unauthorized activity in the Collision Care Account.  On or about February 22, 2018, VF confronted SUSAN G. COPELAND with evidence that she had been responsible for the unauthorized activity.  In a series of conversations, COPELAND denied to VF that she was responsible for the embezzlements from the Collision Care Account and claimed that her identity had been stolen.

31. Shortly after her confrontation with VF, SUSAN G. COPELAND contacted a friend of hers who was employed by the FBI to report that she had been the victim of identity theft. On or about February 28, 2018, in response to COPELAND's report, I called COPELAND on the telephone, identified myself as an FBI Special Agent, and asked to interview COPELAND about the alleged theft of her identity.  COPELAND told me, among other things, that VF had recently confronted her, had shown her copies of unauthorized checks drawn on one of Collision Care's bank accounts along with evidence that online orders had been delivered to her home, and had accused her of embezzling from Collision Care.  COPELAND told me that VF had threatened to call the FBI and report her if she did not repay the stolen funds.

32. SUSAN G. COPELAND falsely represented to me that she had no involvement in or knowledge of the unauthorized transactions when, in truth and in fact, she had been responsible for them.  She also told me that her identity had been stolen and that some unknown person must have been waiting outside her house to retrieve the delivered packages when, in fact, COPELAND had ordered the merchandize and had embezzled Collision Care's funds.

6

## CONCLUSION

33. Based on my training and experience, and based on this investigation to date, there is probable cause to believe that COPELAND committed bank fraud and mail fraud by embezzling funds from the Collision Care Account and COPELAND used the embezzled funds to purchase or pay money towards numerous assets, including the SUBJECT VEHICLE. For the reasons set forth above, your affiant submits that the SUBJECT VEHICLE is a vehicle that was purchased using the proceeds of COPELAND's bank fraud and mail fraud, and is subject to forfeiture to the United States, pursuant to 18 U.S.C. § 982(a)(2), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c).

34. Based upon the above facts, there is probable cause for the issuance of a seizure warrant for the SUBJECT VEHICLE. I thus respectfully request the Court to issue a warrant to seize the SUBJECT VEHICLE.

## **Sealing Request**

35. It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested seizure warrant, including the application, this affidavit, and the requested warrant. I believe that sealing these documents is necessary because the information herein relates to an ongoing investigation. Premature disclosure of the context of the application, this affidavit, and the requested warrant may adversely affect the investigation.

Respectfully submitted,

*/s Kurt Leonard Kuechler*
KURT LEONARD KUECHLER
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on October 8, 2020 (10:55 a.m.)

*/s Timothy R. Rice*
HON. TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE